**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 26 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

DANIELLE BARNES,

      Plaintiff-Appellant,

v.

JO ANNE B. BARNHART,
Commissioner of Social Security
Administration,

      Defendant-Appellee.

No. 02-5153
(D.C. No. 01-CV-359-M)
(N.D. Okla.)

---

**ORDER AND JUDGMENT** *

---

Before **KELLY** , **ANDERSON** , and **O'BRIEN** , Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined

unanimously to grant the parties' request for a decision on the briefs without oral

argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore

ordered submitted without oral argument.

---

\*     This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Claimant Danielle Barnes appeals from the denial of supplemental security income (SSI) benefits, arguing that the administrative law judge (ALJ) erred by concluding that she does not meet or equal one of the listings for mental retardation, either Listing 12.05(C) or (D). See 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05(C), (D).

We exercise jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g). We review the whole record to determine only whether the factual findings are supported by substantial evidence and the correct legal standards were applied. Goatcher v. United States Dep't of Health & Human Servs., 52 F.3d 288, 289 (10th Cir. 1995). We may not reweigh the evidence or substitute our judgment for that of the agency. See Kelley v. Chater, 62 F.3d 335, 337 (10th Cir. 1995). Based on these standards, we reverse and remand for additional proceedings. The ALJ's factual analysis of the record at step three is not supported by substantial evidence. In addition, the ALJ improperly failed to choose and apply one "of the measurement methods recognized and endorsed by [one of] the [four major] professional organizations" dealing with mental retardation when he considered claimant's "deficits in adaptive functioning." 67 Fed. Reg. 20,018, 20,022 (Apr. 24, 2002); 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05.

**I.** **Claimant Meets the Two Specific Prongs of Listing 12.05(C), And Her Impairments Were Established Before Age 22**

Listing 12.05(C) specifically requires that claimant show that she had: (1) a valid verbal, performance, or full scale IQ of 60 through 70; and (2) another significant physical or mental impairment affecting work functions. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05(C). Claimant was born on May 9, 1976, and was 22 years old at the time of the administrative hearing in March 1999. Aplt. App., Vol. II at 24, 42. The evidence shows that claimant meets the specific criteria of Listing 12.05(C), and her impairments were established before the age of 22.

**a.** **First Prong of Listing 12.05(C)**

The listings specify that when verbal, performance, and full scale scores are provided by the IQ test, the ALJ must consider the lowest of these scores. Id. § 12.00(D)(6)(c). Claimant's IQ was assessed on January 12, 1998, when she was 21 years old. Aplt. App., Vol. II at 282-84. Her lowest score was a performance score of 70. Id. at 283. The ALJ therefore properly determined that claimant met the first prong of Listing 12.05(C), id. at 16, and this was before the age of 22.

**b.      Second Prong of Listing 12.05(C)**

This court has held that where an ALJ determines at step two that a claimant's impairment is severe, that impairment is a "significant" limitation of work functions within the meaning of Listing 12.05(C).      Hinkle v. Apfel, 132 F.3d 1349, 1352-53 (10th Cir. 1997).  In this case, the ALJ found at step two that, in addition to claimant's limited IQ, she has additional severe impairments of "obesity, . . ., degenerative disc disease, atopic dermatitis, and adjustment disorder."  Aplt. App., Vol. II at 25 (finding 2).  He found that these impairments were both "significant" and "vocationally relevant."      Id. at 15.  Because "[t]he ALJ's decision [must be] evaluated based solely on the reasons stated in the decision," and because this court may not engage in a "post hoc effort to salvage the ALJ's decision" to deny benefits based on a reason the ALJ did not rely on, the ALJ's step-two finding is not subject to reconsideration by this court. Robinson v. Barnhart, 366 F.3d 1078, 1084-85 (10th Cir. 2004) (quotation omitted).  While the ALJ found that claimant's additional impairments were not independently disabling under listings other than 12.05, they need not be independently disabling to be significant under Listing 12.05(C).      Hinkle, 132 F.3d at 1352.  Therefore, claimant's additional impairments meet the second prong of Listing 12.05(C).  The next question is whether claimant proved that at

least one of these additional impairments was diagnosed before she turned 22. The record conclusively shows that all of them were diagnosed before she was 22.

### c. Claimant's Impairments Were Established Before Age 22

As noted above, claimant's lowest IQ score of 70 was assessed on January 12, 1998, when she was 21. Aplt. App., Vol. II at 282-84. Thus, she has established that she met the first prong of Listing 12.05(C) before the age of 22.

Claimant also has established that she met the second prong of Listing 12.05(C) before age 22. Claimant's atopic dermatitis qualifies to meet the second part of the listing. Doctors' notes on this condition go back at least to February 1986, when claimant was 9. Aplt. App., Vol. II at 399. In July 1996, when claimant was 20, she was hospitalized for five days for problems with her leg. Id. at 199-200. At that time, the reports stated that claimant had a "longstanding" problem with atopic dermatitis, id. at 199, which was diagnosed when she was a child, id. at 201. This had created areas of "chronic skin breakdown," large and small crusted lesions on her legs, and temporary blistering. Id. She was hospitalized because she had swelling in her right leg and pain with bearing weight on it. Id. at 199. Her doctor diagnosed an infection (cellulitis, staphylococcus) on top of preexisting atopic dermatitis. Id. at 201-02. She was treated with antibiotics, elevation of the leg, whirlpool, Ancef, Tylenol, Lidex

-5-

ointment, and Duricef.  Id. at 200.  Surgery (amputation) was considered but was not necessary.  Id. at 129, 200.  Claimant wrote in her disability report that she was schooled at home for two years because her feet hurt so much that she could not walk to classes.  Id. at 129.

Claimant's obesity is also established before the age of 22, as her obesity is noted in the reports about her leg.  Id. at 199, 201.  She reported her height and weight as 5'7" and 284 pounds in a disability application filed on June 10, 1996, when she was 20.  Id. at 123.  This was a month before her hospitalization. Clearly, her obesity started before the age of 20 since she is in the neighborhood of twice the weight she ought to be.

Claimant's degenerative disc disease was diagnosed in February 1996, when she was 19.  Id. at 180.  This condition was discovered when she was treated for back pain following a car accident (she was a passenger).  See id. at 178, 182-84.

Claimant's adjustment disorder was diagnosed along with her IQ in January 1998, when she was 21.  Id. at 284.

Therefore, based on the ALJ's step-two finding and the uncontroverted record evidence, claimant meets both prongs of Listing 12.05(C), and she met them before she turned 22.  It is not necessary to consider whether claimant equals, rather than meets, the specific criteria of Listing 12.05(C).  Cf. Shontos v.

-6-

Barnhart , 328 F.3d 418, 424-27 (8th Cir. 2003) (holding that claimant with IQ of 72, longstanding history of low ability, and additional impairments, did not meet but equaled Listing 12.05(C) in light of agency's Program Operations Manual System).

II.     **The Agency Argues that the Capsule Definition of Listing 12.05 Adds Additional Elements, Including "Deficits in Adaptive Functioning," that Claimant Must Meet**

Listing 12.05 begins with an introductory paragraph stating: "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested . . . before age 22." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05. The agency refers to this introductory paragraph as the "capsule definition" or "diagnostic description." See, e.g. , Aplt. App., Vol. II at 16, 320; 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(A). The next consideration for this case is whether the capsule definition states additional elements that claimant must meet. Appellant argues that it does not; the agency argues that it does.

The regulations did not make clear in 1999, when the ALJ issued the decision in this case, that the capsule definition added elements to Listing 12.05 that the claimant was required to meet over and above the specific criteria

identified in the lettered paragraphs. (Although the capsule definition seems clearly to add at least an age limitation, that is not an issue in this case.) One reason that it was not clear that the capsule definition added elements to the claimant's burden is that Listing 12.05 stated, and still states: "The required level of severity for this disorder is met when the requirements in [lettered paragraphs] A, B, C, or D are satisfied." Id. It appears from the case law controlling in 1999 that the courts of appeals read the capsule definition as a description of mental retardation, not as a statement of elements that the claimant must meet–in addition to the criteria in one of the lettered paragraphs–to prove mental retardation at step three. This court straightforwardly applied the C criteria on several occasions without regard to the capsule definition.

We have found nothing that could have put claimant on notice in 1996 and 1997, when she filed her SSI claims, that there were elements to be proved in addition to the C or D criteria. In February 1998, before the hearing in this case, the agency published an acquiescence ruling that showed the capsule definition to be a required element of 12.05(C). See Soc. Sec. Acquiescence Rul. 98-2(8), 1998 WL 79438, at *2 (rescinded as unnecessary when the regulations were revised in September 2000). But the title (and substantive focus) of that ruling was "Mental Retardation–What Constitutes An Additional and Significant Work-Related Limitation of Function–Titles II and XVI of the Social Security

-8-

Act," which does not suggest any pronouncement about the status of the capsule definition.   Id.   Moreover, the ruling applied by its plain terms only to cases arising in the Eighth Circuit.    Id.   This court had already settled the question of what constitutes an additional and significant work-related limitation of function in Hinkle in 1997.  But even if claimant's counsel read A.R. 98-2(8), that acquiescence ruling did not break out or define the elements added by the capsule definition, or state a standard by which they would be measured.

In September 2000, long after the ALJ had issued his decision in this case, the agency made clear that the capsule definition adds elements to Listing 12.05 by amending the preliminary material in § 12.00 to state that "[i]f your impairment satisfies the diagnostic description in the introductory paragraph [of Listing 12.05]  and any one of the four sets of criteria, we will find that your impairment meets the listing."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(A) (emphasis added).  Unfortunately, this amendment fails either to break out or define the elements purportedly added by the capsule definition, and gives no standard by which they will be measured.

In 2003, the agency published a second acquiescence ruling stating that the capsule definition adds elements to Listing 12.05, but again the agency did not break out or define the elements, or state a standard of measurement.    See Soc. Sec. Acquiescence Rul. 03-1(7), 68 Fed. Reg. 74,279, 74,280 (Dec. 23, 2003).

The agency issued A.R. 03-1(7) because the Seventh Circuit, in remanding a case for further proceedings, directed the agency to disregard the diagnostic description in Listing 112.05 (the nearly identical listing for child mental retardation) because it had not been in effect at the time of the original hearing. Id. (discussing Blakes ex rel. Wolfe v. Barnhart, 331 F.3d 565, 570-71 (7th Cir. 2003)). The agency disagreed with that court's interpretation that the elements of Listings 12.05 or 112.05 had ever been different. Id.

In sum, it is now clear that the capsule definition imposes additional elements to the claimant's burden under Listing 12.05(C) and (D). Prior to the 2000 amendment clarifying this point, however, the case law in this circuit (and others) did not recognize this added burden. In addition, the amendment did not specify what the method and standards of assessment were for this added burden. In any case, as discussed below, under the improvised functional approach to the capsule definition the ALJ actually used, the record does not support his denial of benefits at step three.

**a.** **The ALJ Found, and the Agency Argues on Appeal, that
Claimant Did Not Show "Deficits in Adaptive Functioning," and
Therefore Did Not Meet the Capsule Definition for Listings
12.05(C) and (D)**

The agency argues that the capsule definition of Listing 12.05 adds a

requirement–"deficits in adaptive functioning"–that claimant did not meet.  The

agency argues that the evidence of claimant's daily activities, social skills, and

educational history show that she is not actually so impaired by her low IQ and

physical impairments as to be disabled under Listing 12.05(C) or (D).  The ALJ's

decision states that claimant's low IQ met the first prong of 12.05(C), but

> her impairment does not comply with the "capsule" definition
> paragraph of the Listing.  It requires that her impairment be a
> "significantly subaverage general intellectual functioning with
> deficits in adaptive behavior initially manifested during the
> developmental period (before age 22).["]  Assessment of her usual
> daily activities, her social life, and her educational life fails to reveal
> such deficits in adaptive behavior   .  The claimant maintains neatness
> and grooming, cares for her children.  She went to school to the 10th
> grade and left to be married, not for educational reasons.  The
> dissolution of her marriage was due to her husband's violation of his
> vows, and was not due to her own deficits.

Aplt. App., Vol. II at 16 (emphasis added).

If, however, the capsule definition includes a requirement to show deficits

in adaptive functioning, then there are questions about what that requirement is,

whether claimant was on notice that she needed to present evidence to prove this

-11-

element, and how it should be assessed by the ALJ. We see both factual and legal problems with the agency's argument that claimant did not show deficits in adaptive functioning. Factually, the record does not support the ALJ's conclusion under the ad hoc functional approach he applied. Legally, his analysis does not comply with the Commissioner's (subsequent) direction that ALJs choose and apply one "of the measurement methods recognized and endorsed by [one of] the [four major] professional organizations" dealing with mental retardation. 67 Fed. Reg. at 20,022. For these reasons, the case must be remanded, and the ALJ must identify which standard he has selected so that this court will be able to provide a meaningful review if there is a second appeal, and so that claimant can supplement the record with any additional proof she wishes to present on this element.

**b. The ALJ's Functional Assessment of Claimant's Deficits in Adaptive Functioning is Not Supported By Substantial Evidence, and the Case Should Be Reversed**

Factually, the record does not provide substantial support for the ALJ's findings about claimant's daily activities, social skills, and educational history, which were the predicate for his conclusion that she did not have deficits in adaptive functioning prior to age 22. The record does not show that claimant had

much of a social life. The only evidence on this point is from claimant's and her mother's testimony at the hearing. The hearing took place in March 1999, when claimant was 22. Aplt. App., Vol. II at 44. She testified that her daily activities amounted to almost nothing. Id. at 54-56. There is no evidence that she had any friends. She sat or lay down a lot on account of her back pain. Id. at 54-56, 64. (She is not prescribed strong pain medication because she attempted suicide by taking an overdose of Zoloft. Id. at 64-65, 209.) She had trouble sleeping and only slept about four hours a night. Id. at 68. At the time of the hearing, she had lived alone in an apartment behind her mother's house for at least a year. Id. at 47, 74. Claimant visited her children, as they lived with her mother. Id. at 47, 54, 57. On an average day, she would play a little with her children or change a diaper, help her mother with things around the house, and help cook dinner. Id. at 55-56. Her children made her nervous, and she would leave the house to calm down. Id. at 65. She gave up driving because it gave her "panic attacks." Id. at 48. (Even if the allegation of panic attacks is disregarded, the point is that claimant gave up driving.) She sometimes visited her grandmother, aunts, or father, and some of them would drive her to a store if she needed to go. Id. at 48, 71.

Based on the evidence of claimant's social life and daily activities, it appears that claimant lived in a structured home setting with family support, a

significant point under the regulations.  The ALJ was supposed to have considered whether claimant's home setting was structured in a way that minimized the mental demands on her, and therefore her symptoms, and should have discussed the evidence showing that she had ability to function outside of that setting.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(F).  The ALJ did not address this point.

There are references that claimant was neatly dressed and groomed, but it is not clear from the record whether she dressed herself.      E.g., Aplt. App., Vol. II at 282, 408, 410.

Claimant did not care for her children, and the ALJ contradicted himself on this point.  Cf. id. at 16 (noting that claimant cares for her children)      with id. at 20 (noting that claimant's mother was claimant's children's primary caretaker and "claimant spends her days free of household or childcare responsibility").  Claimant separated from her husband in August 1997,      id. at 410; was living with her mother in November 1997, when she was 21,      id. at 242; and she had been living alone in the apartment behind her mother's house for a year or more before the administrative hearing in March 1999,      see id. at 47.  She turned 22 in May 1998.  It therefore appears from the record that her children started living with her mother when claimant was 21.  There is no evidence about the kind of care

she gave her children when they lived with her and, therefore, no basis for any conclusion on this point.

The record shows that claimant was basically a failure at school. She finished the tenth grade and then quit. Id. at 48. She never got a GED, id. at 48-49, and it is not clear that she is eligible to take that test, even if she wanted to, see id. at 167. Although she did not flunk out of school, she repeated the second grade, id. at 149, 155, and was in special education classes most of the way through school. School officials would try her in regular classes and then move her back to special education. Id. at 49. The grades included in the record (from elementary school) are mixed, including two F's, several D's, and several notations that she was below grade level. Id. at 171. She was given comprehensive tests in June 1992, at the age of 16. Id. at 147-51. Her scores ranged from low average to adequate to low to very low (several in the bottom tenth percentile), depending on the ability tested. Id. at 150-51. Overall, she was assessed to be functioning at a low range of overall intellectual ability. Id. at 151. Her Iowa Basic Skills results in March 1990, when she was 13, showed low scores (bottom tenth percentile) in almost every category. Id. at 160. An achievement test done in March 1993, when claimant was 16, showed low scores in almost all categories. Id. at 162. The record suggests that she dropped out of school because she was pregnant. Id. at 320.

The record shows that claimant called a telephone helpline in November 1997, when she was 21 years old, stating that she and her husband were having problems in their marriage, and that her husband blamed her for them.     Id. at 242. This evidence tends to contradict the ALJ's finding that her marriage ended solely because of her husband's infidelity and not because of her deficits.  The record does indicate that claimant separated from her husband after he was unfaithful. E.g., id. at 209.

In short, the record does not support the ALJ's summary analysis that claimant's usual daily activities, her social life, and her educational life fail to show deficits in adaptive behavior to meet the capsule definition for Listings 12.05(C) and (D).

In addition, the ALJ's conclusion that claimant is unmotivated to work is not supported by the record.  The ALJ relied on claimant's ability to get four jobs, rejecting her testimony that she could not perform any of them without pointing to any evidence to contradict her claim that she was slow and made mistakes with money and counting inventory.    Id. at 23.  The only evidence in the record is that she obtained four jobs, that lasted for two-three weeks to two-three months, and that she could not perform them.

The vocational expert testified that claimant's past jobs did not qualify as past relevant work because of their short duration. See id. at 77. She was employed for about two months in 1991-92 at Braun's (a restaurant, it appears) as a server, but after calling in three weeks in a row only to be told that she was not scheduled to work, she gave up on it. Id. at 58-59, 120, 128. She worked for a month as a carhop in 1995 at Sonic, but was not as fast as the other employees, and that job ended for that reason. Id. at 59, 120, 128. She worked for less than three weeks in 1998 as a cashier at Smitty's, a convenience store, but she could not remember the prices of the products, and she was let go because of complaints about her work. Id. at 60, 114. She also worked part-time for less than three months in 1998 as a cashier at Curt's Oil, another convenience store, but was unable to perform inventory counts satisfactorily. Id. at 59-60, 115. She made only $1891.19 on all four jobs. Id. at 113-15. The ALJ rejected claimant's testimony, stating that she had not proven that she was slow. Id. at 23. But there is no evidence to suggest that claimant actually performed satisfactorily on any of her jobs. This is similar to the ALJ's finding that claimant is unmotivated to work, id. at 20, a finding for which there is no evidentiary support at all. On the contrary, the only comments about claimant's attitude in the record are that she was cooperative and appeared to make a good effort at what she was doing. E.g.,

id. at 149-50, 168. As a result, the ALJ's conclusion that claimant is not disabled at step three must be reversed.

III.    **The ALJ on Remand Should Identify and Apply a Professionally-Recognized Method of Measuring "Deficits in Adaptive Behavior" and Allow Claimant to Supplement the Record**

The Commissioner publicly announced in April 2002 that there are at least four possible definitions of "deficits in adaptive functioning"–from the four major professional organizations dealing with mental retardation.     See 67 Fed. Reg. at 20,022. This is the first reference we found anywhere to a definition for the elements in the capsule definition in Listing 12.05, and it appeared long after the agency had issued its final decision in this case. Even so, the Commissioner expressly declined to adopt any particular one of these definitions because the four major organizations use somewhat different definitions and methods for assessing them. 67 Fed. Reg. at 20,022. The Commissioner considers the definition of mental retardation reflected in the listings to be consistent with these definitions, although not identical to any one of them, and "allow[s] use of any of the measurement methods recognized and endorsed by the professional organizations." Id. The ALJ in this case, however, essentially improvised his

own definition for "deficits in adaptive functioning," which, as we have seen, was not supported by the evidence.

On remand, the ALJ must choose a standard consistent with the Commissioner's directive. See id. For example, the American Psychiatric Association (APA) provides one definition for "deficits in adaptive functioning" in the DSM-IV. Id. The APA states that "deficits in adaptive functioning" are shown by "significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Id. The APA also provides a measurement standard: "[T]he criterion of significance is a summary index score that is two or more standard deviations below the mean . . . ." Id. The record in this case clearly shows that claimant has limitations in some of the areas the APA considers relevant, but whether they are "significant" under the APA's standard (or meet the requirements of whichever standard the ALJ might decide to use) is unknown. Because claimant was not on notice when she created her record that she had to prove this element, the ALJ, on remand, should give claimant an opportunity to supplement the record.

## IV.    Conclusion

Because the capsule definition is common to Listing 12.05(C) and (D), the ALJ's reversible error concerning the capsule definition necessitates a remand of the case for further proceedings with respect to both listings.  Claimant should be given an opportunity to supplement the record.

The judgment of the United States District Court for the Northern District of Oklahoma is REVERSED, and the case is REMANDED with directions to REMAND to the agency for additional proceedings consistent with this disposition.

Entered for the Court


Terrence L. O'Brien
Circuit Judge