**Thomas L. FISCHER, Plaintiff–Appellant,**

v.

**Jo Anne B. BARNHART, Comissioner of Social Security, Defendant–Appellee.**

No. 04–2323.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 26, 2005.

Decided Feb. 11, 2005.

Ashley S. Rose, Glen Ellyn, IL, for Plaintiff–Appellant.

Thomas P. Walsh, Office of the United States Attorney, Chicago, IL, for Defendant–Appellee.

Before EASTERBROOK, RIPPLE, and EVANS, Circuit Judges.

## ORDER

Thomas Fischer, who has cerebral palsy and a low IQ, appeals from the district court's grant of summary judgment affirming the Commissioner of Social Security's decision denying benefits. The ALJ determined that Fischer's impairments, although severe, do not constitute or functionally equal a listed impairment, and that he can perform his past relevant work. Fischer argues that substantial evidence does not support the ALJ's conclusions (1) that his limitations do not meet a listed impairment or (2) that he could resume his past relevant work. Fischer also argues that the ALJ failed to adequately articulate his reasoning with regard to residual functional capacity.

From a very early age, Fischer had a low IQ and symptoms of cerebral palsy, a "nonprogressive motor disorder appearing in young children and resulting from brain damage caused by birth trauma or intrauterine pathology." *Dorland's Illustrated Medical Dictionary* 1307 (29th ed.2000). No one disputes that Fischer has cerebral palsy, and our case therefore centers primarily around Fischer's claim that he is mentally retarded. Because he must establish that he developed deficits in his general intellectual functioning and ability to adapt to his environment prior to age twenty-two in order to be entitled to benefits under the listing for mental retardation, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.05(C), his childhood records are especially relevant to his case.

In 1963, when Fischer was four, a school psychologist administered standardized tests and concluded that Fischer's motor and performance skills were poor for his age, but that he had "at least" normal intellectual ability. Fischer had good verbal reasoning skills, and could discriminate objects in pictures, follow simple commands, compare shapes and sizes, and even recognize some words up to the eight-year level. On the other hand, Fischer did not know his colors, could not count, had a short attention span, and was unable to perform visual-motor coordination tasks above the three-and-one-half-year level. The psychologist also noted that Fischer was "unusually secure" for his age, interacted well with both his parents and strangers, appeared happy and interested in learning, and did not require a lot of individual attention.

A psychiatrist specializing in school assessment analyzed Fischer again when he was eleven and opined that he was "functioning at a low average range of intelligence," with a likely learning disorder rather than mental retardation. The examiner administered the Wechsler Intelligence Scale for Children and determined that Fischer had a Verbal IQ of 87, a performance IQ of 72, and a full-scale IQ of 78. These scores, the examiner opined, showed that Fischer could continue to adapt to a mainstream classroom, although he was functioning on an educational level a full two to three years behind his current grade. The examiner characterized Fischer's behavior and approach to education as "immature" and "particularly dependent," noting that he spoke quite slowly with a "babyish" intonation.

The record contains absolutely no further medical information over the next thirty years of Fischer's life. The next entry—an assessment of Fischer's condition by Dr. N. Musa filed in conjunction with an application for disability benefits— is dated February 2001. In the 30–year dark period Fischer apparently went to school and worked as a computer operator at Ecko Housewares, where he earned up to $48,000 a year. Fischer applied for benefits when he lost the Ecko position; about eighteen months later he found a new job and amended his application to cover only the period of his unemployment.

Dr. Musa and a psychologist, Dr. Terrance E. McGovern, provide the only other medical opinions in the record based on personal observation of Fischer. Noting Fischer's complaints of difficulty learning as quickly as other people and remembering things, Dr. Musa stated his impression that Fischer suffered from mental retardation as well as a number of physical ailments not disputed here. Dr. McGovern, in contrast, concluded that Fischer was on the "borderline range" of intellectual functioning and probably had an organically-based hemispheric deficit. Dr. McGovern observed that Fischer's thought processes were "logical, well-ordered, and relevant to the task at hand." He described Fischer's motivation and task persistence as "satisfactory," and noted that his speech was "fluent," although his articulation was somewhat weak. After administering the Wechsler Adult Intelligence Scale III, Dr. McGovern concluded that Fischer had a full-scale IQ of 78, a verbal IQ of 89, and a performance IQ of 70.

Three psychiatrists reviewed Fischer's medical records for the state disability agency and concluded that he did not meet a disability listing. Dr. Donald Henson, reviewing under listing § 12.05 (regarding-mental retardation), and Drs. John Tomassetti and Bronwyn E. Rains, together reviewing under listing § 12.02 (regarding organic mental disorders), all opined that Fischer might have a learning disability, but any impairments were not severe.

They all agreed that Fischer faced only mild limitations on his activities of daily living, social functioning, and ability to concentrate. Nor did the psychiatrists believe that Fischer suffered any repeated episodes of decompensation, which the regulations define as temporary exacerbations of symptoms accompanied by a loss of the ability to adapt to the demands of daily living. In drawing these conclusions, the psychiatrists noted that they specifically relied on Fischer's school psychological reports and IQ scores, as well as his seventeen-year work history as a computer operator.

Three state agency physicians reviewed Fischer's medical records and concluded that he retained the residual functional capacity to perform medium work with few limitations. Dr. Henry S. Bernet opined that Fischer could lift 50 pounds occasionally and 25 pounds frequently. He also believed that Fischer could stand or walk about six hours in a workday, sit about six hours, and push or pull for an unlimited period. Dr. Bernet identified no manipulative, visual, or communicative limitations for Fischer; he noted that Fischer should never climb a ladder, rope, or scaffold, only occasionally be required to balance, and avoid concentrated exposure to hazards like machinery or heights. Overall, Dr. Bernet concluded that Fischer had "no major or significant restrictions, with the exception of the unsteady gait, which could be resolved by the use of a cane." Dr. Glen Wichterman appears to have contemporaneously reviewed the record; he signed off on Dr. Bernet's conclusions. Dr. Robert Saban completed his residual functional capacity assessment separately from these other two physicians, but his conclusions were exactly the same.

At Fischer's hearing before the ALJ, he testified that he had a twelfth-grade education that included both regular and special education classes, and that he can read and write, albeit slowly. Fischer testified that he can add and subtract as well as multiply and divide to a certain degree. Physically, Fischer reported problems balancing and walking up and down stairs, specifically while carrying things. He can walk fairly far, so long as the ground is level. He does, however, suffer from speech and memory problems. Fischer testified that he currently lives with a friend, Cynthia Graves, and her son. Although he does not manage his own finances, he can drive a car, go to the store, and get along with other people. Fischer noted that he is particularly active with his church, where he sometimes helps to set up chairs and tables for special functions.

Fischer explained that he had worked as a computer operator at Ekco for seventeen years before the company laid off all of its employees as part of a sale of the business. At Ekco, he delivered reports, ran backups, and made sure the computer system operated properly. Fischer did not think that he had any problems doing that work, except when "special" tasks arose; then he "had to have people, you know, with me that knew what they were doing." He learned how to produce most reports by repetition and did the necessary typing with one finger. About sixteen months after losing his position at Ekco, Fischer obtained a computer operator position at Klein Tool. Fischer testified that he believes his supervisors at Klein are happy with his work.

Fischer's friend and housemate, Ms. Graves, testified that his activities were constrained by a number of physical and mental limitations. Graves testified that Fischer fell quite often, most recently at church just one week earlier. She stated that Fischer had no organizational skills, and that his parents handled his finances for him. She added that he becomes frus-

trated when he lacks routine, and that he's had "a lot of problems" at Klein because of his inability to adapt.

Stanley Hunton, a vocational expert, testified that there were jobs existing in the economy that Fischer could perform. Hunton explained that, because Fischer received assistance in performing his position at Ekco, it could best be described as a "computer operator/helper" job, light work and "marginally semi-skilled." In response to further questioning from the ALJ, Hunton opined that a hypothetical person with the limitations present in Fischer's medical records should be able to return to Fischer's past work. Hunton further suggested that this hypothetical individual could work as a locker room attendant or room service clerk (800 jobs in Chicago metropolitan area), shipping/receiving clerk (2000 jobs), or transportation attendant (900 jobs).

In February 2003 the ALJ issued a written decision denying Fischer disability benefits. Following the five-step analysis laid out in 20 C.F.R. § 404.1520, the ALJ first concluded that Fischer was not engaged in substantial gainful activity during the period for which he was seeking benefits. The ALJ then concluded that Fischer suffered from a severe impairment, cerebral palsy, during that period. Based on the assessments of the state agency physicians and psychiatrists, however, the ALJ concluded that Fischer's impairments did not meet listing § 12.05C regarding mental retardation. The ALJ then cited the residual functional capacity assessments and concluded that Fischer could return to his past work as a computer operator helper. Therefore, Fischer was not "disabled" as the Social Security Act defines the term. Because the Appeals Council denied Fischer's request for review, the ALJ's decision stands as the final decision of the Commissioner.

Fischer then sought judicial review of the Commissioner's decision under 42 U.S.C. § 405(g). The parties consented to the exercise of full jurisdiction by a magistrate judge and judge Edward A. Bobrick was assigned to the case. The judge rejected Fischer's sole argument, that he met listing § 12.05C, noting that although Fischer had a low IQ and some physical limitations, he was never diagnosed as mentally retarded. Accordingly, he affirmed the ALJ's decision.

Under the Social Security Act, a person is "disabled" if he is unable to engage in substantial gainful activity due to "a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *Rice v. Barnhart*, 384 F.3d 363, 365 (7th Cir.2004). Our task is to review the ALJ's determination to see if it was supported by "substantial evidence." *Id.* at 369.

■ On appeal, Fischer first argues that the ALJ's decision was not supported by "substantial evidence" because his step-three determination that Fischer's condition did not meet listing § 12.05(C) was "patently wrong." Fischer claims generally that he meets the listing because he had an IQ of 70 and his cerebral palsy "imposed limitations of function, *e.g.,* falling quite often; lack of coordination; a career involving accommodated employment."

According to listing § 12.05(C), a person is mentally retarded if he has "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period ... before age 22." 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.05(C). "Adaptive functioning" refers to a person's ability to perform activities of daily living

and social functioning. *Id.* In addition, § 12.05C requires a claimant to demonstrate a certain "level of severity" for this disorder; Fischer sought to make such a showing by introducing "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work related limitation of function."

Substantial evidence supports the ALJ's conclusion that Fischer's condition does not meet listing § 12.05(C). All of the psychiatrists who reviewed the record for the state agency opined that the listing was not met, diagnosing Fischer with not mental retardation, but a learning disorder that only mildly impaired his daily activities. Because state agency doctors are experts on determining medical equivalence, an ALJ may properly rely on their opinions. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir.2004). Although the parties do not dispute that Fischer has a low IQ and some functional limitations from his cerebral palsy, Fischer has not pointed to any evidence in the record that identifies deficits in his adaptive functioning prior to age twenty-two, as required by the listing. *Blakes v. Barnhart,* 331 F.3d 565, 570 (7th Cir.2003); *Foster v. Halter,* 279 F.3d 348, 354–55 (6th Cir.2001). Indeed, this record contains only minimal evidence concerning his medical condition before he turned twenty-two. The school psychiatrist who examined Fischer at age four reported, in fact, that Fischer was "unusually secure" and adept at social interaction; the examiner who reported on Fischer when he was eleven found him capable of functioning in a regular classroom. The fact that Fischer later worked for seventeen years without material complaints from his employer further exemplifies his adaptive abilities. Although low IQ scores are indicative of retardation, other factors, such as the claimant's life activities, properly play into the ALJ's analysis. *See*

*Maggard v. Apfel,* 167 F.3d 376, 380 (7th Cir.1999) (low IQ scores did not demonstrate mental retardation where claimant showed a strong ability to relate with fellow workers and supervisors, understand and follow instructions, and withstand the stress of daily work); *Markle v. Barnhart,* 324 F.3d 182, 187 (3d Cir.2003). Here, both the reviewing psychiatrists and the ALJ appropriately concluded that, although Fischer suffered from a learning disability that imposed some limitations on his work, he did not meet the listing for mental retardation.

■ ·Fischer next argues for the first time that substantial evidence does not support the ALJ's determination that he had previously engaged in substantial gainful activity and could resume his past relevant work. He claims—again only generally—that his position at Ecko was not substantial gainful activity because it was "accommodated," in that he typed with one finger, sometimes fell, and had to "call for help in order to complete certain reports."

The social security regulations define substantial gainful activity as "work activity that involves doing significant physical or mental activities." 20 C.F.R. § 404.1572; *see Stevenson v. Chater,* 105 F.3d 1151, 1154 (7th Cir.1997). Earnings of more than $700 per month create a rebuttable presumption of substantial gainful activity. 20 C.F.R. § 416.974. It is possible, however, to earn a "decent wage" and still not engage in gainful activity; if, for example, a claimant's job is maintained only through extensive assistance or employer charity, that job is not evidence that the claimant can actually work. *Jones v. Shalala,* 21 F.3d 191, 192–93 (7th Cir.1994) ("if the claimant had a kindly employer or kindly fellow employees, or had reached the bare threshold ... by dint of exertions

that he could not sustain on a full-time basis, these circumstances could rebut the presumption of substantial gainful employment"); *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir.1994) (work not substantial gainful employment where claimant's productivity was half of other employees' and involved "constant on-site supervision").

■ First, Fischer has waived this argument because he did not present it to Judge Bobrick. *See Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir.2000). In any event, substantial evidence does support the ALJ's determination that Fischer's work at Ekco was substantial gainful activity to which he could return. During his last year at Ekco, Fischer's salary exceeded $48,000—a sum that readily creates a presumption of substantial gainful activity under the regulations. 20 C.F.R. § 416.974. Further, when asked if he had problems doing that work, Fischer replied "not really." He testified that he needed help only when there were special reports to create; then he needed instructions from someone who knew how to create them. Nor is there any indication in the record that Fischer required constant supervision or produced less than other employees, even if he did type with one finger or occasionally fall on the job. *Cf. Boyes*, 46 F.3d at 512 (claimant not engaged in substantial gainful activity where he was supervised constantly and produced half of what other employees produced). And Fischer's seventeen-year successful work history suggests that, even if he had some subjective concerns about his own ability to work, his employer was satisfied to keep him on the job over that extended tenure. *See Byington v. Chater*, 76 F.3d 246, 251 (9th Cir. 1996) (promotion was evidence of substantial gainful activity). Fischer produced and delivered reports and met his employer's expectations for the duration of his

employment; this is not a case where a worker was "retain[ed] . . . on the payroll even though he is incapable of working." *Jones*, 21 F.3d at 192. Accordingly, the ALJ's step-four determination did not lack evidentiary support.

■ Fischer also argues for the first time that the ALJ failed to minimally articulate the reasoning behind his residual functional capacity determination because he merely "adopted" the conclusion of the state agency physicians. Fischer claims that the ALJ should have analyzed his capacity "on a function-by-function basis" and that the ALJ failed to "build a bridge" between the evidence and his conclusions.

An ALJ is not required to provide a written evaluation of every piece of evidence, but need only "minimally articulate" his reasoning so as to "make a bridge" between the evidence and his conclusions. *Rice*, 384 F.3d at 371. Where the ALJ does not reject any countervailing evidence, he need not articulate his reasons for accepting the medical opinions in the record. *Scheck*, 357 F.3d at 700–01. The ultimate question is whether the ALJ's decision is sufficiently specific to facilitate meaningful review. *Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir.2003).

■ As before, Fischer has waived this argument because he did not present it to Judge Bobrick. *See Shramek*, 226 F.3d at 811. In any event, the ALJ's residual functional capacity determination was adequately articulated. The ALJ expressly adopted the opinions of the state physicians, who all opined that Fischer could perform medium work with only mild limitations. Fischer does not point to any evidence in the record suggesting that he lacked the residual functional capacity to work; indeed, according to his own testimony, he worked before and after the closed period in question even though his condition remained unchanged. Without

any conflict in the record, the ALJ was not required to state reasons for adopting the state physicians' unequivocal opinions. *Scheck,* 357 F.3d at 700–01.

Accordingly, the judgment below is AFFIRMED.