**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 8, 2009

Charles R. Fulbruge III
Clerk

No. 08-30783

ANNETTE RANDALL,

Plaintiff-Appellant,

versus

MICHAEL J. ASTRUE, Commissioner of Social Security,

Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Louisiana

Before JOLLY, SMITH, and BENAVIDES, Circuit Judges.

PER CURIAM:

Annette Randall appeals a judgment denying her application for supplemental security income benefits. We affirm.

## I.

### A.

We first describe the legal framework.[1] The Social Security Act ("SSA"), 42 U.S.C. ch. 7, entitles certain "disabled" individuals to supplemental security income benefits ("SSI benefits"). 42 U.S.C. § 1381a. Under the statute, disabled individuals are those who are "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." § 1382c(a)(3)(A). The statute requires that the Commissioner of Social Security "establish by regulation uniform standards which shall be applied at all levels of determination, review, and adjudication in determining whether individuals are under disabilities." § 421(k)(1); *see* § 1382c(a)(3)(H)(i).

Accordingly, the Commissioner promulgated a complex scheme of regulations for administering benefits, *see* 20 C.F.R. ch. III, pts. 404, subpt. P, 416, subpt. I, including a "five-step sequential evaluation process" for disability determinations, § 416.920(a)(1). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[2] Step three provides that "[i]f you have an impairment(s) that meets or equals one of our listings in appendix 1 to subpart P of part 404 of this chapter and meets the duration requirement, we will find that you are disabled."

---

[1] *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("The [social security] system's administrative structure and procedures, with essential determinations numbering into the millions, are of a size and extent difficult to comprehend.").

[2] *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987); *accord* § 416.920(d); *see generally Bowen v. Yuckert*, 482 U.S. 137, 141-42 (1987).

§ 416.920(a)(4)(iii).

Appendix 1, in turn, includes diagnostic descriptions for various disabilities and addresses mental disorders in Listing 12, 20 C.F.R. ch. III, pt. 404, subpt. P, app. 1 (the "C.F.R. Listing"). Listing 12.05 contains "an introductory paragraph with the diagnostic description for mental retardation" and "four sets of criteria (paragraphs A through D)." C.F.R. Listing 12.00(A).

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> OR
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> OR
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

C.F.R. Listing 12.05.

B.

In 2004, then thirty-nine-year-old Annette Randall applied to the Social Security Administration for SSI benefits, claiming that a disability had befallen her earlier that year. She was married and lived with her husband and one of her six children. She claimed to suffer from high blood pressure, dizziness, migraine headaches, and nerves. Tests conducted in 2004 revealed congestive heart failure and related complications. To evaluate her functional capacities, multiple medical professionals examined her, including clinical psychologist Alfred Buxton, who conducted a review of her personal history, a clinical interview, and a psychometric assessment.

Randall obtained an overall IQ score of 69, and Buxton rendered the following findings: She could cook, clean, communicate, manage time, and travel independently; she was alert and responsive; and she possessed good receptive and expressive skills for everyday conversational purposes, good social skill, good abilities to attend and concentrate, good judgment and reflective cognition, and fair reasoning. According to Buxton, Randall "would function in the mild/borderline range of mental retardation adaptively," and "[o]n a day-to-day basis overall

4

general functioning is felt to more closely approximate borderline mental retardation as opposed to mild mental retardation." Buxton concluded that Randall's physical and mental conditions "would not preclude gainful competitive employment though there may be some parametric restrictions placed on the type of employment she could engage in on an ongoing basis."

Dr. Lawrence Klusman also assessed Randall's functional capacities and found that she exhibited no marked limitations in understanding or memory, sustained concentration and persistence, social interaction, or adaptation. According to Klusman's assessment,

> [Randall's] level of intellectual development will permit her to acquire simple skills and work-related knowledge. She understands verbal directives and is able to follow them. She can attend to a task and work at an adequate pace during the course of a regular work period. She may not be suited for extensive interaction with the public but would be able to manage brief, structured encounters. [She] would be most suited for work that has minimal requirements for flexibility, reading skills, or changing task demands.

In six of the seven years preceding her application, Randall was employed as a housekeeper.

The regional social security commissioner denied Randall's application for SSI benefits, so she requested a hearing before an administrative law judge ("ALJ"), to whom she argued that her impairments satisfied Listing 12.05(C). At step three of the evaluative process, the ALJ premised her analysis on an important legal conclusion:

> The threshold requirement of Listing 12.05 . . . is that and [sic] individual have mental retardation, which is defined as significantly subaverage general intellectual functioning with deficits in adaptive

5

functioning initially manifested during the developmental period. Beyond that, there are a number of different ways to meet the requirement of the listing, all depending on either valid IQ scores or a limitation of function . . . .

The ALJ concluded that Randall did not "have an impairment or combination of impairments that meets or medically equals one of the listed impairments" in Appendix 1, because Randall had failed to meet "the threshold requirement of mental retardation, defined as significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period."[3] Accordingly, the ALJ found that Randall suffered from no "disability" within the meaning of the SSA. The Appeals Council denied Randall's request for review.

Randall sought review in federal court, arguing that substantial evidence did not support the ALJ's rejection of the Listing 12.05(C) argument and that the diagnostic description's "adaptive functioning" term ought not operate as an independent measurement of mental retardation under Listing 12.05; the Commissioner presented multiple grounds for affirming the ALJ's denial. A magistrate judge ("MJ") recommended affirming by concluding that Listing 12.05(C)'s diagnostic description required an independent showing of deficits in adaptive functioning and that the ALJ's decision on that ground was supported by substantial evidence.

Randall objected, arguing that Listing 12.05(C) imposes no such requirement. The district court agreed with Randall and directed the MJ to consider only whether the paragraph C conditions had "manifested before [Randall]

---

[3] The ALJ also discussed Randall's physical abilities and determine that she could engage in work as a housekeeping cleaner.

reached the age of 22."

Despite the court's instruction, the MJ again evaluated Randall's claim by requiring proof of "deficits in adaptive functioning" and recommended affirming the ALJ's decision. After Randall objected again, the district court adopted the MJ's position of requiring proof of "deficits in adaptive functioning."[4] The court did not reject Randall's claim on that ground, however, because it found that substantial evidence supported the manifestation of the adaptive deficits during the developmental period. Instead, the court concluded that substantial evidence supported rejecting Randall's claim for failure to satisfy the latter half of paragraph C—the existence of "a physical or other mental impairment imposing an additional and significant work-related limitation of function."

II.

In an appeal from an ALJ's denial of SSI benefits, we review the ALJ's decision alone to determine whether she applied the proper legal standard and, if so, whether substantial evidence supports her decision.[5] Our review of the ALJ's

---

[4] *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *Wingo v. Bowen*, 852 F.2d 827, 829 (5th Cir. 1988). *Cf. United States v. Matthews*, 312 F.3d 652, 657 & n.5 (5th Cir. 2002) ("'Under the law of the case doctrine, an issue of fact or law decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal.' . . . At the same time, law of the case is not a jurisdictional rule, but a discretionary practice. . . . The doctrine has three exceptions: (1) The evidence at a subsequent trial is substantially different; (2) there has been an intervening change of law by a controlling authority; and (3) the earlier decision is clearly erroneous and would work a manifest injustice" (quoting *Tollett v. City of Kemah*, 285 F.3d 357, 363 (5th Cir. 2002)).).

[5] Though we are reviewing the district court's judgment, we often recite our standard of review without mentioning the court *a quo*, because the statute charges district and circuit courts with performing an identical substantial-evidence review. *See* 42 U.S.C. § 405(g); *Ward*
(continued...)

decision is further circumscribed in important respects by the Commissioner's specific position in this appeal. Before this court, the Commissioner separates the question whether Randall satisfied Listing 12.05's diagnostic description from the question whether she satisfied paragraph C. The Commissioner concedes that Randall satisfied the Listing 12.05(C) IQ and "physical or other mental impairment" requirements[6] and argues *only* that "the ALJ properly found that Randall did not meet the first requirement of listing 12.05C because she did not have deficits in adaptive functioning manifested before age 22." As a result, the only questions before the court are (1) whether satisfaction of Listing 12.05(C) requires an independent demonstration of "significantly subaverage intellectual functioning with deficits in adaptive functioning initially manifested . . . before age 22," C.F.R. Listing 12.05, and, (2) if so, whether substantial evidence supports the ALJ's decision.

A.

1.

The legal question is straightforward: We must construe Listing 12.05 and determine the precise relationship between the diagnostic description's substan-

---

[5] (...continued)
*v. Celebrezze*, 311 F.2d 115, 116 (5th Cir. 1962) ("The Government makes an appealing argument that the Congress did not intend that there should be a review of the evidence by two courts for a determination of the substantiality of the evidence. However plausible this contention may be, we are not persuaded that we should depart from the judicial precedents holding otherwise.").

[6] According to the Commissioner, "[t]he District Court found that Randall did not meet Listing 12.05C because she did not meet the third requirement—a physical or other mental impairment imposing an additional and significant work related limitation of function. The Commissioner concedes that the District Court's reasoning is incorrect."

tive requirements ("significantly subaverage intellectual functioning with deficits in adaptive functioning"), the diagnostic description's temporal requirement ("initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22"),[7] and the four severity criteria (paragraphs A, B, C, and D). We are presented with three markedly different constructions to choose among. In the context of a claim under Listing 12.05(C), the possible constructions are as follows:

> (1) An impairment satisfies Listing 12.05 if the claimant presently exhibits the severity criteria (IQ and limitation of function). In this reading, the diagnostic description and temporal language pose no independent requirements.

> (2) An impairment satisfies Listing 12.05 if (a) the claimant presently exhibits the severity criteria, and (b) the severity criteria manifested during the developmental period. In this reading, the diagnostic description's substantive language poses no independent requirement.

> (3) An impairment satisfies Listing 12.05 if (a) the claimant presently satisfies the diagnostic description's substantive requirements, (b) the claimant shows that the impairment satisfying the diagnostic description's substantive requirement manifested during the developmental period, and (c) the claimant presently exhibits

---

[7] The regulations contemplate the addition of specific temporal elements in § 404.1525:

Most of the listed impairments are permanent or expected to result in death. For some listings, we state a specific period of time for which your impairment(s) will meet the listing. For all others, the evidence must show that your impairment(s) has lasted or can be expected to last for a continuous period of at least 12 months.

20 C.F.R. § 404.1525(c)(4).

the severity criteria.[8]

Randall argues for construction (2); the Commissioner, for (3).

Our circuit has yet to resolve this question. Our only opinion to address it, *Arce v. Barnhart*, 185 F. App'x 437 (5th Cir. 2006), rejected a Listing 12.05C claim by concluding, without elaboration, that "[b]ecause there is substantial evidence that [the claimant] does not have deficits in adaptive functioning, there is substantial evidence that she does not meet listing 12.05C." *Id.* at 439. That unpublished case does not have precedential effect. *See* 5TH CIR. R. 47.5.4. In *Selders v. Sullivan*, 914 F.2d 614 (5th Cir. 1990), we said that "Section 12.05(C) defines an impairment to include a valid verbal, performance, or full scale I.Q. score of 60-69 inclusive, *and* a physical or other mental impairment imposing additional and significant work-related limitations of function;" we also opined that "[a] claimant must prove both of these conditions in order to meet his burden under step three." *Id.* at 619. But because the *Selders* claimant failed to establish the requisite IQ score, the court did not reach the issue of whether the

---

[8] We need not address the question of whether the temporal requirement should extend beyond the diagnostic description to the severity criteria, because the Commissioner does not try to justify the ALJ's decision on the ground that Randall failed to satisfy the temporal requirement with respect to the paragraph C elements. Thus, we attend to the temporal requirement only insofar as it extends to the diagnostic description's substantive requirement.

Along similar lines, several circuits presume that an impairment was "initially manifested during the developmental period" if the claimant establishes the requisite impairment in the present . *See Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001); *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985) (applying the presumption to IQ scores). Others refuse to erect such a presumption. *See Markle v. Barnhart*, 324 F.3d 182, 188 (3d Cir. 2003). Because we resolve Randall's claim by evaluating only the present characteristics of her alleged impairment, we need not opine on this issue.

diagnostic paragraph imposes any additional requirement. *Id.*[9]

The SSA provides the touchstone for our analysis, because Listing 12.05 represents the Commissioner's effort to determine which impairments meet the statutory definition of disability. Section 423(d)'s definition of "disability" includes two limiting elements: a definition of impairment and a severity requirement.

To qualify as a "physical or mental impairment," the condition must be "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." § 423(d)(3). To meet the severity requirement, the impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work." § 423(d)(2)(A). This distinction between an impairment's existence and its severity is fundamental to an understanding of Listing 12.05.

Like the statute, the Secretary's disability-determination regulations separate the question of the impairment's existence from the question of its severity. After reciting the statutory definition of disability, *see* 20 C.F.R. § 404.1505(a), section 404.1508 addresses the means by which claimants must prove the exis-

---

[9] In *Hamilton v. Shalala*, No. 94-30218, 1994 WL 612289 (5th Cir. Oct. 17, 1994) (unpublished), we stated that "Listing 12.05 provides that a person is classified as mentally retarded and qualifies for benefits if that person has 'a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function.'" *Id.* at *1. Because, however, the claimant in *Hamilton* failed to show the requisite severity, the court did not confront the issue we face today. *See id.* at *2 ("Since the Secretary found that Hamilton did not have a valid verbal, performance, or full scale IQ of 60 through 70, the Secretary did not have to assess whether Hamilton's impairments were imposing a significant work-related limitation.").

tence of an impairment:

> If you are not doing substantial gainful activity, we always look first at your physical or mental impairment(s) to determine whether you are disabled or blind. Your impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental *impairment must be established* by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms.

§ 404.1508 (emphasis added). Several other sections make it plain that the two inquiries are distinct. The section addressing evidence requires that applicants "provide medical evidence showing *that you have an impairment(s) and how severe it is* during the time you say that you are disabled."[10]

Additional evidence of the separation's importance comes from § 404.1520a, which describes the "special technique" of mental impairment evaluations: "Under the special technique, we must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s)." § 404.1520a(b)(1). After identifying an impairment, the Commission attempts to "rate the degree of functional limitation resulting from the impairment(s)," § 404.1520a(b)(2), and *only then* does the Commission address severity, *see* § 404.1520a(d) ("After we rate the degree of functional limitation resulting from your impairment(s), we will determine the

---

[10] § 404.1512(c) (emphasis added); *see also* § 404.1520(c) (distinguishing an "impairment" from a qualifying "severe impairment"); § 404.1513(a) ("We need evidence from acceptable medical sources to establish whether you have a medically determinable impairment(s)."); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria."

severity of your mental impairment(s).").[11]

Finally, we come to the Listing of Impairments, which provides an introduction and set of specific listings for each of various body systems. *See* C.F.R. Listing; 20 C.F.R. § 404.1525(c)(1). Listing 12 addresses nine specific mental disorders and begins with a set of introductory instructions, *see* C.F.R. Listing 12; the Listing's introductory instructions are no less mandatory than is Listing 12.05 itself, *see* 20 C.F.R. § 404.1525(c)(2). Accordingly, every mental disorder listing includes two independent components: a diagnostic description of the disorder and specific criteria measuring the disorder's severity.[12]

After an introductory paragraph sets out a diagnostic description, most of the listings include the following text: "The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied." *E.g.*, C.F.R. Listing 12.02. If the Listings were our only text, this provision—particularly the "is met" command—might tempt us to construe the diagnostic description's substantive language as a mere precatory introduction to the binding requirements enumerated in paragraphs A through D. But the Listings do not stand alone; the surrounding statutes and regulations take care to distinguish the severity inquiry from the threshold de-

---

[11] *See also* § 404.1529(b) ("Your symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."); § 404.1529(c)(1) ("When the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, we must then evaluate the intensity and persistence of your symptoms so that we can determine how your symptoms limit your capacity for work.").

[12] C.F.R. Listing 12.00(A)-(C) (separating "documentation of a medically determinable impairment[]" from "consideration of the degree of limitation such impairment(s) may impose").

termination of whether an impairment exists.

More importantly, Listing 12 specifically rejects this construction. To ensure that the severity determination is not confused with the predicate determination of impairment, 12.00(A) separates the requirements and requires satisfaction of *both*: "We will find that you have a listed impairment if the diagnostic description in the introductory paragraph *and* the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied."[13]

It is certainly true that "[t]he structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings." C.F.R. Listing 12.00(A). Listing 12.05 employs four enumerated paragraphs instead of the typical three to describe the severity criteria, and only one paragraph must be met instead of a combination of two. Those differences do nothing, however, to relieve claimants of the initial burden of demonstrating that their impairment satisfies the introductory paragraph's diagnostic description.

The statutory and regulatory context informs Listing 12.05 just as much as it does every other mental disability listing, and Listing 12.05 does nothing to disclaim the distinction between an impairment's existence and an impairment's severity. Like its counterparts, Listing 12.05 says that "[t]he required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied." C.F.R. Listing 12.05. But again the regulations give a specific instruction that reiterates the need to satisfy both the diagnostic description *and* the severity criteria: "If your impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria, we will find

---

[13] C.F.R. Listing 12.00(A) (emphasis added); *see also* § 404.1525(c)(3) ("We will find that your impairment(s) meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction . . . .").

that your impairment meets the listing."[14]  Without a challenge to this regulation's legitimacy, we must give it effect.

For similar reasons, we find no principled basis for giving effect to only part of the diagnostic description.  That is, nothing in Listing 12.05 suggests that the temporal language is any more binding than is the substantive portion of that very same sentence.  This is particularly so given that the respective phrases––the language of the diagnostic description's substantive requirement and the language of the severity paragraphs––carry such different meanings. [15]

Accordingly, the ALJ did not err in construing Listing 12.05 to require an independent showing of "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; that is to say, the evidence demonstrates or supports onset of the impairment before age 22."

2.

Our construction of Listing 12.05 accords with the published holdings of

---

[14] C.F.R. Listing 12.00(A) (emphasis added).  As promulgated in 1985, Listing 12 included no such provision.  Federal Old-Age, Survivors, and Disability Insurance; Listing of Impairments—Mental Disorders, 50 Fed. Reg. 35038, 35066-70 (Aug. 28, 1985).  The agency added the instructions in its 2000 revisions.  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50776 (Aug. 21, 2000).

[15] *Compare* C.F.R. Listing 12.00(C)(1) (defining "adaptive activities" to include "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office") *with* C.F.R. Listing 12.05(A)-(D) (defining severity in terms of I.Q.).  Where two terms within the same sentence carry such distinct denotations, it is not our role to decide which is of sufficient import to deserve enforcement.  Although, under this construction of the regulation, some claimants may satisfy the specific severity criteria but not the general diagnostic description, where, as here, the regulation accords with the statute, our role in construing the regulation is not to second-guess the agency's policies but only to construe its words.

at least three (and perhaps four) other circuits. Soon after the 2000 revisions, the Sixth Circuit held that claimants must satisfy the diagnostic description's substantive requirements independently of the severity criteria:

> A claimant must demonstrate that her impairment satisfies the diagnostic description for the listed impairment in order to be found disabled thereunder. As the Commissioner has pointed out, recent amendments to the regulations further clarify that a claimant will meet the listing for mental retardation only "[i]f [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria . . . ."

*Foster v. Halter*, 279 F.3d 348, 354–55 (6th Cir. 2001) (citations omitted).[16]

There is substantial evidence to support the ALJ's conclusion that Randall does not meet the listing for mental retardation. First, the evidence does not demonstrate or support onset of the "significantly subaverage general intellectual functioning with deficits in adaptive functioning" before age 22. . . . Moreover, the evidence does not demonstrate or support onset of "deficits in adaptive functioning" before age 22.

In *Wall v. Astrue*, 561 F.3d 1048 (10th Cir. 2009), the court adhered to the same construction, concluding that "[t]o come within the scope of listing 12.05, a claimant must satisfy that listing's [diagnostic] definition." *Id.* at 1062. "Part

---

[16] *Accord West v. Comm'r Soc. Sec. Admin.*, 240 F. App'x 692, 697-98 (6th Cir. 2007); *Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007); *Carmack v. Barnhart*, 147 F. App'x 557, 560 (6th Cir. 2005); *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 872 & n.1 (6th Cir. 2003).

of listing 12.05's [diagnostic] definition is the requirement that a claimant exhibit subaverage general intellectual functioning before the age of twenty-two." *Id.*[17] The Seventh Circuit's position was once uncertian,[18] but it now utilizes the construction that we adopt: In *Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007), it required that its Listing 12.05(C) claimant satisfy the description's definition of mental retardation "in addition to" the severity criteria. An IQ between 60 and 70 "is insufficient, even with the presence of some impairment, to establish disability per se on grounds of mental retardation." *Id.* Rather, "[t]he key term in the introductory paragraph of section 12.05 of the regulation, so far as bears on this case, is 'deficits in adaptive functioning.'" *Id.* at 710.

The Eighth Circuit's opinions are best read as agreeing. In *Maresh v. Barnhart*, 438 F.3d 897 (8th Cir. 2006), the only Eighth Circuit decision to confront the text of 12.00(A), the Commissioner argued that "the introductory paragraph of the Listing requires that the deficits in adaptive functioning are initially manifested before age 22," and the court "agree[d] with the Commissioner that the requirements in the introductory paragraph are mandatory." *Id.* at 899. Although *Maresh* did not use explicit language to embrace the imposition of the diagnostic paragraph's substantive requirement, it seems to have done so impliedly when it said that "this court disagrees with the Commissioner that the Listing's introductory paragraph requires a formal diagnosis of mental retarda-

---

[17] *See also Lax v. Astrue*, 489 F.3d 1080, 1085 (10th Cir. 2007) ("In addition to meeting this [diagnostic] definition, a claimant *must also meet* one of the four severity prongs for mental retardation as listed in the regulations" (emphasis added).). *Accord Barnes v. Barnhart*, 116 F. App'x 934, 938-39 (10th Cir. 2004).

[18] *See Fischer v. Barnhart*, 129 F. App'x 297, 301-02 (7th Cir. 2005); *Mendez v. Barnhart*, 439 F.3d 360, 361-62 (7th Cir. 2006); *Griffin v. Barnhart*, 198 F. App'x 561, 564 (7th Cir. 2006); *Adkins v. Astrue*, 226 F. App'x 600, 604-05 (7th Cir. 2007).

tion." *Id.* Had the *Maresh* court intended to impose only the temporal aspect of the diagnostic description, the distinction between diagnosed and undiagnosed cases of mental retardation would have been unnecessary.[19]

Unpublished opinions from three other circuits support our construction. Even before the 2000 amendments, the Eleventh Circuit had held that the diagnostic description imposed more than just temporal requirements: "To be considered for disability benefits under section 12.05, a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." *Crayton v. Callahan*, 120 F.3d 1217, 1119 (11th Cir. 1997). Although *Crayton* did not explicitly distinguish these requirements from the severity criteria, later unpublished decisions did.[20]

In *Morales v. Comm'r of Soc. Sec.*, 2 F. App'x 34 (1st Cir. 2001), the court rejected a claim made under 12.05(C) by citing the diagnostic description, not the severity criteria.[21] In *Brooks v. Barnhart*, 167 F. App'x 598 (9th Cir. 2006), the court relied on the "significantly subaverage general intellectual functioning"

---

[19] *Cf. Johnson v. Barnhart*, 390 F.3d 1067, 1071 (8th Cir. 2004) (rejecting a Listing 12.05(C) claim where the claimant "did not display the significant limitations in adaptive functioning that 12.05 requires.").

[20] For example, *Pettus v. Astrue*, 226 F. App'x 946 (11th Cir. 2007), cited the standard from *Crayton*, then added, "In addition, for presumptive disability under 12.05C, the claimant must have (1) a valid IQ score of 60 through 70 inclusive, and (2) an additional mental or physical impairment significantly affecting the claimant's ability to work." *Id.* at 948. *Accord Humphries v. Barnhart*, 183 F. App'x 887, 889 (11th Cir. 2006); *Burt v. Barnhart*, 151 F. App'x 817, 820 n.2 (11th Cir. 2005).

[21] *Morales*, 2 F. App'x at 37 ("The problem with claimant's argument is that there simply is no evidence in the record that claimant had any 'deficits in adaptive behavior initially manifested . . . before age 22.'").

requirement to deny a Listing 12.05(C) claim.[22]

Since the 2000 revision to Listing 12, some circuits have continued to require only the severity criteria and temporal requirement (but not the diagnostic description's separate substantive requirement) without discussion of the textual change. *See Grant v. Astrue*, 255 F. App'x 374, 374 (11th Cir. 2007)[23]; *Bailey v. Apfel*, 230 F.3d 1063, 1065-66 (8th Cir. 2000).[24] *Dictum* from another circuit does so as well.[25]

---

[22] *Brooks*, 167 F. App'x at 599-600 ("To establish that she meets either listing, the claimant must show that she has: 'significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period: *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.' In addition, she must establish that she has a valid IQ score within the ranges set forth in paragraph B or C. Paragraph C further requires an additional severe mental or physical impairment that imposes 'an additional and significant work-related limitation of function.'" (citations omitted)).

[23] *But see Garrett v. Astrue*, 244 F. App'x 937, 938 (11th Cir. 2007) (rejecting a Listing 12.05(C) claim where "the ALJ found that [the claimant] did not have the required deficits in adaptive functioning").

[24] Other recitations of that interpretation came *before the 2000 revisions*, and often as *dicta* in cases in which the decision rested on satisfaction (or not) of another requirement. *See, e.g.*, *Flowers v. U.S. Dep't of Health & Human Servs.*, 904 F.2d 211, 213-14 (4th Cir. 1990) (awarding benefits after recognizing that "the narrow question before us is whether there is substantial evidence to support the decision that [the claimant] did not meet the second part of [Listing 12.05(C)].").

[25] *See Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003) ("To meet the requirements of § 12.05C a claimant must i) have a valid verbal, performance or full scale IQ of 60 through 70, ii) have a physical or other mental impairment imposing additional and significant work-related limitations of function, and iii) show that the mental retardation was initially manifested during the developmental period (before age 22)."). In *Markle*, the ALJ's denial of the SSI claim rested upon the claimant's failure to satisfy the severity criteria's IQ threshold. *Id.* at 187-89. As a result, the court remanded to the ALJ and avoided the question whether the claimant met "the third element of a § 12.05(C) listed impairment, namely, whether his retardation commenced before age 22." *Id.* at 189. In *Vivaritas v. Comm'r of Soc. Sec.*, 264 F. App'x 155 (3d Cir. 2008), the court quoted *Markle*'s recitation of the Listing 12.05(C) requirements
(continued...)

No matter what Listing 12.05 required before 2000, the clarifying revisions best evince the relationship between the diagnostic description's components and the severity criteria. Accordingly, we join those circuits that pay close attention to that change.

B.

Having determined that the ALJ applied the proper legal standard, we address the question whether substantial evidence supports her factual findings. "Substantial evidence is more than a scintilla, less than a preponderance, and is such that a reasonable mind might accept it as adequate to support a conclusion." *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "We may not reweigh the evidence or substitute our judgment for that of the Commissioner." *Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007).

The ALJ, by relying on various kinds of evidence, including the Buxton and Klusman reports, in particular, concluded that Randall failed to exhibit "significantly subaverage general intellectual functioning with deficits in adaptive functioning." After reviewing the record that was before the ALJ, we agree that her ultimate finding as to Randall's adaptive functioning was backed by substantial evidence. In particular, the ALJ was entitled to rely on the clinical psycholo-

---

[25] (...continued) and said that "[a] claimant seeking benefits pursuant to listed impairment 12.05(C) has the burden of providing evidence showing that the claimed impairment commenced during the developmental period" but did not make plain whether the proof of the "claimed impairment" would refer to the diagnostic description or the severity criteria. *See id.* at 160-61 ("Here, as was true of the claimant in *Markle*, [the claimant] produced evidence suggesting that her claimed mental impairment had an onset before she reached the age of 22.").

gists' specific analysis of Randall's physical and mental capabilities, including the determination that she suffered from only "mild/borderline" adaptive retardation and that her impairments "would not preclude gainful competitive employment." *See, e.g.*, *Domingue v. Barnhart*, 388 F.3d 462, 463 (5th Cir. 2004).

Randall does not contend otherwise. Instead, her only argument is that we cannot affirm the ALJ's decision on this ground (Randall's failure to satisfy the diagnostic description's adaptive functioning element), because the district court rejected this argument and affirmed on another ground: Randall's failure to establish 12.05(C)'s "additional and significant work-related limitation of function." It is well established, however, that even though the case comes to us on appeal from a final judgment of the district court, we focus our review not on the district court's decisional process but on the ALJ's. *See, e.g.*, *Ward v. Celebrezze*, 311 F.2d 115, 116 (5th Cir. 1962). The district court's rejection of the diagnostic-definition argument does not prevent the Commissioner from reasserting that argument here and prevailing thereby.[26]

### III.

In summary, Randall has failed to demonstrate that the ALJ applied an erroneous legal standard or to show that the ALJ's conclusions are supported by less than substantial evidence. As a result, there is no reversible error in the ALJ's denial of Randall's claim. The judgment is AFFIRMED.

---

[26] *See also Flournoy v. Century Fin. Co.* (*In re Henderson*), 577 F.2d 997, 1002 n.5 (5th Cir. 1978) ("An appellate court may consider alternative bases offered by appellees for upholding the judgment below, even though they were not relied on by the district court and appellees have not filed a formal cross appeal.").